## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Christopher J. Toomey, a United States Federal Bureau of Investigation Task Force
Officer, being first duly sworn, hereby depose and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.      I submit this affidavit in support of an application for a warrant to search the
following vehicle:

**Black 2021 Nissan Sentra (hereafter, the "TARGET VEHICLE"):**
**Bearing VIN 3N1AB8CV4MY206862**
**with Massachusetts license plate 2AEW38**

Based on the information contained herein, there is probable cause to believe that the TARGET
VEHICLE, described in Attachment A, contains evidence, fruits, and instrumentalities of the
crime of 21 U.S.C. §§ 841 [Possession with the Intent to Distribute Controlled Substances].

## II.    AGENT BACKGROUND

2.      I am a Task Force Officer ("TFO") with the United States Federal Bureau of
Investigation ("FBI") having served in this capacity since October of 2020. From 2010 to 2020, I
served as a law enforcement officer with the Nashua Police Department, Nashua, New
Hampshire. Since 2019, I have been assigned to the Nashua Police Departments Narcotics
Intelligence Division.

3.       In my law enforcement training and experience, I have had an opportunity to
search for, seize, and personally observe what I have recognized to be and what was later
confirmed by drug analysis to be scheduled drugs, including but not limited to heroin, fentanyl,
methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various
narcotics lawfully available only by prescription.  I have conducted or participated in among

1

other things, surveillance, undercover transactions, debriefings of informants and confidential human sources, and reviews of taped conversations relating to narcotics trafficking.  I have assisted in many other investigations, both state and federal. I have drafted drug related search and arrest warrants and have assisted in the execution of numerous search and arrest warrants in which controlled substances, drug paraphernalia, drug related electronic data, and other contraband were found. Through my training and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

4.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

5.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, including their direct examination of relevant documents, and physical surveillance conducted in connection with persons and places mentioned in this affidavit. The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of the search warrant.  Accordingly, while this affidavit contains all the material information, I am aware of that is pertinent to the requested search warrant, it does not include each and every fact known by me or other investigators concerning the investigation.

III.   **STATUTORY AUTHORITY**

6.      This investigation relates to offenses committed in the District of New

Hampshire, to wit: distribution of controlled substances, specifically, methamphetamine, a Schedule

II controlled substance, in violation of 21 U.S.C. § 841(a)(1).  21 U.S.C. § 841(a)(1) makes it a

crime for any person "knowingly or intentionally to … distribute . . . or possess a controlled

substance with the intent to distribute." . . . defined in [Title 21]."

IV.   **PROBABLE CAUSE**

7.      Based on my training and experience, and the facts set forth in this affidavit, I

have probable cause to believe Philip "PJ" Wetmore ("WETMORE") has distributed Schedule II

controlled substances, namely: methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and

uses the TARGET VEHICLE to facilitate his drug trafficking.

8.      Since September of 2021, an FBI Confidential Human Source ("CHS") has been

cooperating with the FBI in exchange for considerations on criminal charges. CHS has various

convictions for Felon in Possession of Dangerous Weapon, Criminal Threatening with Deadly

Weapon, Criminal Mischief, Possession of a Weapon While Committing a Violent Crime,

Violation of Parole/Probation, Theft, Shoplifting, Criminal Threatening, Robbery, Stalking,

Simple Assault, Conduct After Accident, Driving Under the Influence, Domestic Violence, and

Controlled Drug Act violation.

9.      In February 2022, while under direct supervision of FBI Agents and during the

course of a controlled drug transaction, the CHS was observed on an audio/video recording

smoking an unknown substance from a water filtration-smoking device.  When confronted by

FBI Agents about this observation seen on the audio/recording device, the CHS explained that

WETMORE and the CHS were smoking marijuana from the water filtration-smoking device and

that the CHS believed that he/she was lawfully permitted to due to so because the CHS has a

State of New Hampshire medical marijuana prescription.  This unlawful activity was reported to and adjudicated via FBI policy and procedure.  Since the CHS has begun cooperating, FBI Agents believe that the information the CHS has provided has been truthful and reliable, as CHS's information has been corroborated by audio and video recordings, surveillance, and information obtained from public records, and other sources.

10.     On February 1st and February 2nd, 2022, the FBI formulated plans to have the CHS purchase one ounce (approximately 28 grams) of methamphetamine from WETMORE on February 2, 2022 at WETMORE's residence, ▇ Chandler Street, First Floor Apartment on South Side of the building, in Nashua, New Hampshire ( ▇ Chandler Street") and in doing so, the CHS contacted WETMORE via text message and the two arranged for the purchase of the ounce of methamphetamine for $600 of U.S. Currency. [1] It should be noted the CHS contacted WETMORE via text at both ▇ 2174 and ▇-8130 in order to negotiate the controlled drug transaction.  Both numbers are known to law enforcement agents to be used by WETMORE.

11.     On February 2, 2022, at approximately 12:26pm FBI Agents contacted the CHS and then transported the CHS to a pre-arranged meeting location and searched CHS's person for contraband, weapons, and currency, with negative results. In the presence of FBI agents, the CHS was directed to contact WETMORE via a phone call to confirm the location of the pre-negotiated drug transaction.

12.     WETMORE advised the CHS to respond to ▇ Chandler Street.  FBI agents provided the CHS with $600 in serialized currency and equipped the CHS with an audio/video recording device that FBI agents activated prior to the CHS leaving the pre-arranged location.

---

[1] The FBI retained screen shots of the text message communications between the CHS and WETMORE.

13.     At approximately 1:28 p.m., the CHS left the presence of FBI Agents handling the CHS and responded directly to ▮Chandler Street via foot.  At approximately 1:31 p.m., the CHS entered ▮Chandler Street. At approximately 1:43 p.m., the CHS exited ▮Chandler Street and proceeded to respond directly back to the FBI Agents handling the CHS at the pre-arranged location.  The CHS was under constant and unbroken surveillance for the duration of this controlled drug transaction.  The only time the CHS was not under surveillance was when the CHS was inside of ▮Chandler Street.

14.     The CHS provided the FBI Agents handling the CHS the audio/video recording device, and one glassine baggie containing a crystal-like substance believed to be methamphetamine which the FBI agents later field-tested utilizing a TruNarc laser-testing device and received a presumptive positive result for methamphetamine and weighed approximately 30.2 grams with packaging materials).  FBI agents searched the CHS for contraband, weapons, and unexplained currency with negative results.  The FBI will send the suspected methamphetamine to the Drug Enforcement Administration ("DEA") laboratory for further testing.

15.     The CHS stated that upon the CHS arriving at ▮Chandler Street, the CHS was met by WETMORE who had opened the entrance door allowing the CHS to enter.  The CHS provided a description of the entrance to WETMORE's residence which was confirmed and positively identified by FBI Agents as the only entrance on the south side of ▮Chandler Street. The CHS positively identified WETMORE as the male subject who opened the entrance door allowing the CHS to enter.  Prior to this operation, the CHS provided social media images of WETMORE to FBI Agents identifying WETMORE as the individual the CHS was going to purchase methamphetamine from.  FBI Agents were able to confirm that these social media

images of WETMORE were in fact WETMORE by comparing them to previous law
enforcement booking photographs of WETMORE.

16.     The CHS stated that upon entering ▆ Chandler Street, the CHS determined that
WETMORE was the only occupant within the residence.  The CHS described the interior of ▆
Chandler Street as a small studio apartment.  The CHS stated there is an interior door which
leads to a common basement, and second interior door which leads to a common hallway.  The
CHS added during his/her contact with WETMORE, he/she never left the small studio
apartment.  During the CHS' contact with WETMORE, the CHS stated WETMORE provided
the CHS with a glassine baggie containing the suspected crystal-like substance believed to be
methamphetamine, and in return, the CHS provided WETMORE with the $600.00 in serialized
Currency.  The CHS further advised FBI agents that the CHS observed WETMORE to be in
possession of at least four more glassine baggies that contained a similar crystal-like substance
that the CHS believed to be methamphetamine.  The CHS stated the other four baggies were
similar in size to the baggie the CHS had purchased from WETMORE.  The CHS further stated
that the CHS observed a grip of a pistol in the rear waistband of WETMORE's pants.

17.     FBI Agents subsequently reviewed the audio/video recording of the narcotics
transaction in its entirety and confirmed that the recordings, statements made by the CHS, and
the observations made by members of surveillance team were consistent and accurate with one
another.  FBI Agents were also able to positively identify the male subject who completed the
controlled drug transaction with the CHS as WETMORE from previously reviewing law
enforcement booking photographs of WETMORE as well as reviewing social media images of
WETMORE which were provided by the CHS.

18.     On February 9th and 10th, 2022, the FBI formulated plans to have the CHS

purchase two ounces (approximately 56 grams) of methamphetamine from WETMORE on

February 10, 2022, at a location to be determined later in Nashua, New Hampshire.  Acting at the

direction of the FBI, the CHS contacted WETMORE via text messages and telephone calls to

arrange for the purchase of the two ounces of methamphetamine.  During these communications,

WETMORE texted the CHS that he was staying at Motel 6, room 332.  The CHS further

explained that he/she believed WETMORE was staying at a "Motel 6, 332." The CHS had

previously informed me the CHS had previously been with WETMORE at the Motel 6 at Exit 5

in Nashua, New Hampshire. I know as a Nashua, New Hampshire police officer that there is a

Motel 6 located off of Exit 5 in Nashua. It should be noted the CHS contacted WETMORE via

text at both ███████-2174 and ███████-8130 to negotiate the controlled drug transaction.  Both

numbers are known to law enforcement agents to be used by WETMORE.

19.     On February 10, 2022, at approximately 10:48 a.m., FBI agents met the CHS at a

pre-arranged meeting location.  It should be noted the CHS was in his/her personal vehicle

during the duration of this operation.  At the direction of, and in the presence of FBI agents, the

CHS placed a recorded phone call into WETMORE at ███████-8130 to continue the

arrangement of the controlled drug transaction.  During the phone call, FBI agents overheard

heard a male voice answer the phone call who I recognized as WETMORE.  WETMORE

directed the CHS to meet him at the Burlington Coat Factory, located at 51 Gusabel Avenue, in

Nashua, New Hampshire.

20.     At approximately 11:30 a.m., the CHS, still under constant and unbroken FBI

surveillance, responded to a secondary pre-arranged meeting location.  At approximately 11:31

a.m., FBI agents searched CHS's person for contraband, weapons and currency, with negative

results.

21.     FBI agents provided the CHS with $1020.00 in serialized currency and equipped the CHS with an audio/video recording device that FBI agents activated prior to the CHS leaving the pre-arranged location.

22.     At approximately 11:49 a.m., the CHS left the presence of FBI agents handling the CHS and responded to directly to the area of front entrance of the Burlington Coat Factory in the CHS's vehicle and under FBI surveillance.  At approximately 11:51 a.m., a member of the Nashua Police Department's Narcotics Intelligence Division observed a male matching the description of WETMORE exit from his residence door at ■ Chandler Street and enter the driver's seat of the TARGET VEHICLE.

23.     At approximately 12:00 p.m., FBI agents, and members of the Nashua Police Department's Narcotics Intelligence Division observed the TARGET VEHICLE pull into and park in the parking lot of the Burlington Coat Factory where FBI Agents were able to positively identify the operator, and single occupant of the TARGET VEHICLE as WETMORE.

24.     At approximately 12:02 p.m., WETMORE exited the TARGET VEHICLE with a backpack on his back, approached the CHS's vehicle, and advised the CHS accompany him into the Burlington Coat Factory.  At approximately 12:02 p.m., the CHS and WETMORE entered the main entrance of Burlington Coat Factory.  At approximately 12:07 p.m., the CHS exited the same entrance of the Burlington Coat Factory and responded directly back to the CHS' vehicle. The CHS was under constant and unbroken FBI surveillance for the duration of this controlled drug transaction.  The only time the CHS was not under FBI surveillance was when the CHS was inside of the Burlington Coat Factory for approximately five minutes.

25.     Once the CHS left the immediate area of the Burlington Coat Factory, FBI Agents maintained surveillance on WETMORE and the TARGET VEHICLE.  At approximately 12:13 p.m., while continuing surveillance on both WETMORE and the TARGET VEHICLE, FBI

agents observed WETMORE exit from the Burlington Coat Factory wearing the same backpack he was first observed wearing and went to the trunk of the TARGET VEHICLE where WETMORE opened the trunk and placed the backpack into the right side of the trunk. While standing at the open trunk, FBI agents observed WETMORE emptying the contents of his jacket pockets into a second backpack located on the left side of the trunk of the TARGET VEHICLE. WETMORE then grabbed the first backpack he was observed wearing and closed the trunk, leaving the second backpack within the trunk of the TARGET VEHICLE, and entered back into the Burlington Coat Factory.

26.     Upon meeting with CHS at a pre-arranged meeting location, the CHS provided the FBI agents handling the CHS the audio/video recording device, and one glassine baggie containing a crystal-like substance believed to be methamphetamine, which the FBI agents later field-tested utilizing a TruNarc laser-testing device and received a presumptive positive result for methamphetamine that weighed approximately 56.81 grams (with packaging materials). FBI agents searched the CHS for contraband, weapons, and unexplained currency with negative results. The FBI will send the suspected methamphetamine to the DEA laboratory for further testing.

27.     The CHS stated that upon arriving at to the Burlington Coat Factory, the CHS was met by WETMORE who had approached the CHS's vehicle on foot. Upon making contact with WETMORE, the CHS stated that WETMORE displayed a glassine baggie containing a crystal-like substance believed to be methamphetamine to the CHS. The CHS instructed WETMORE to drop the suspected methamphetamine inside of the CHS's vehicle which the CHS secured in the glove box of the CHS's vehicle.

28.     WETMORE then asked the CHS to enter the Burlington Coat Factory to complete the controlled drug transaction. The two then entered the Burlington Coat Factory together and

walked between two clothes aisles in the men's section.  The CHS put the $1,020.00 of serialized

U.S. Currency in a pair of gray jeans and handed the jeans to WETMORE.  WETMORE

explained to the CHS that he was currently in possession of a pistol that WETMORE said he had

removed the serial number with a dremel tool.  WETMORE also said that he was willing to sell

the pistol to the CHS for $700.

29.     WETMORE also told the CHS that he was in possession of "two pounds of dope"

and a "kilo of ice."  I know that "dope" is a common slang/street term for heroin and or fentanyl

and "ice" is a common slang/street term for methamphetamine.  FBI Agents then asked the CHS

where the CHS believed WETMORE would keep the firearm and narcotics he informed the CHS

about.  The CHS stated he/she believed WETMORE would either keep the firearm in his

backpack or within the TARGET VEHICLE as WETMORE is typically known to do.

30.     The CHS positively identified WETMORE as the male subject who sold him/her

the methamphetamine and advised the FBI agents that he/she did not make contact with anyone

else other than WETMORE.

31.     Prior to this operation, the CHS provided social media images of WETMORE to

FBI agents identifying WETMORE as the individual the CHS was going to purchase

methamphetamine from.  FBI agents were able to confirm that these social media images of

WETMORE were in fact WETMORE by comparing them to previous law enforcement booking

photographs of WETMORE.

32.     FBI agents subsequently reviewed the audio/video recording of the narcotics

transaction in its entirety and confirmed that the recordings, statements made by the CHS, and

the observations made by members of surveillance team were consistent and accurate with one

another.  FBI agents were also able to positively identify the male subject who completed the

controlled drug transaction with the CHS as WETMORE from previously reviewing law

enforcement booking photographs of WETMORE as well as reviewing social media images of

WETMORE which were provided to the FBI by the CHS.

33.     As mentioned earlier in this affidavit, WETMORE was observed operating the

TARGET VEHICLE from his residence of ▓ Chandler Street in Nashua, New Hampshire to the

Burlington Coat Factory in Nashua, New Hampshire.  During this investigation, FBI agents

determined that WETMORE's New Hampshire operating privileges are suspended, and

WETMORE was also required to provide insurance while operating a motor vehicle.  It was also

discovered from reviewing WETMORE's criminal background that WETMORE is a convicted

felon and is prohibited by law from owning and or possessing a firearm.

34.     At approximately 1:32 p.m., members of the Nashua Police Department placed

WETMORE under arrest as WETMORE exited the main entrance of the Burlington Coat

Factory.  WETMORE was found to be in possession of a loaded silver .357 magnum Smith and

Wesson revolver style pistol, with what appeared to be an obliterated serial number.

35.     With the totality of the circumstances surrounding this investigation, I believe

there is probable cause to believe there are more controlled substances within the TARGET

VEHICLE.  The TARGET VEHICLE was towed back to the Nashua Police Department and

secured in garage bay 6 pending the application of a federal search warrant.  The TARGET

VEHICLE was under constant and unbroken observation from the parking lot of the Burlington

Coat Factory and garage bay 6 of the Nashua Police Department.

Training and Experience Concerning Items to be Seized

36.     Based upon my training and experience, as well as the collective knowledge and

experience of other agents and police officers in my office, I am aware that drug traffickers very

often store controlled substances, firearms, and other tools of the drug trade in their homes,

automobiles, garages or outbuildings on their properties, basements, or other places under their

immediate control.  I am aware that it is generally a common practice for drug traffickers to store

their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic

baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other

locations they access with frequency.  Based on my training and experience, powder drugs such

as fentanyl and methamphetamine are generally brought into the region in bulk.  However, such

drugs are not typically consumed by users in such high purity form.  Rather, such powder drugs,

when ultimately consumed by the user, are at a lower purity level.  High purity powder drugs are

reduced in purity by the addition of dilutants.  This process is called "cutting" or "stepping on"

the drug. Other equipment, such as scales, presses, grinders, razor blades, glass panes, blenders,

and mirrors, and the like are typically used in this cutting process. Once the drug has been "cut,"

a usual practice is to repackage or "press" it in smaller quantities such as ten (10) gram fingers or

other types of plastic bags for redistribution.

    37.    It is generally a common practice for drug traffickers to maintain in hard copy or

on other electronic devices, records relating to their drug trafficking activities. Because drug

traffickers in many instances will "front" (that is, sell on consignment) controlled substances to

their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such

record-keeping is necessary to keep track of amounts paid and owed, and such records will also

be maintained close at hand so as to readily ascertain current balances.

    38.    Drug traffickers will commonly maintain records and documents which provide a

paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual

transactions. There are many reasons why an individual will generally maintain records for long

periods of time. One reason is that the records will often seem innocuous because of their nature

(e.g. financial, credit card and banking documents, travel documents, receipts, client lists,

documents reflecting purchases of assets, personal calendars, telephone and address directories,

check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software).  Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence.  Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten.  To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

39.    Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them.  They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

40.    It is also a generally common practice for traffickers to conceal at their residences and vehicles, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.

41.    Often, drug traffickers possess firearms and other dangerous weapons in their vehicles to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

42.    Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.  I am aware that items such as cell phones and U.S. currency are often located in a residence, vehicle, or on an individual's person.

43.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

44.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

45.     I know that individuals who distribute narcotics often utilize motor vehicles to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles to transport controlled substances to various locations to meet with and distribute controlled substances to potential drug purchasers.

<u>Training and Experience on Digital Devices</u>

46.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  I am aware that collections of cell phones have been found during drug trafficking search warrants of stash

houses, residences and vehicles that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

47.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones.  I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection.  Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

48.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.  Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

49.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premise it is not always possible to search digital devices for digital data for a number of reasons, including the following:

    a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

    b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

50.     Based on my training and experience, some smartphones can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those

published by Apple, that some models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

51.     If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

52.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

53.     Although Apple's Touch ID may be the most common or well-known means for unlocking a device with a fingerprint, I am aware that other brands of smartphones like Samsung also offer a similar feature that works essentially the same way.  Therefore, when I refer to

"Touch ID" I am not just referring to Apple devices, but to similar technology on all smartphones.  While I believe that the targets of this investigation likely use smartphones, I am not aware of the particular brand of phone that they use.

54.     The passcodes that would unlock the targets' devices is not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock devices with the use of the fingerprints of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

55.     Based on the facts discussed in this affidavit I believe that WETMORE is the primary user of cellular telephone number ██████ 2174 and ██████-8130, and thus his fingerprints are among those that are able to unlock the device via Touch ID.  We intend to call this numbers when searching the **Target Vehicle**. If the phones ring, and the user is present, I request authority to place his or her fingers on the Touch ID sensors to unlock the device.

## VI.    <u>CONCLUSION</u>

56.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (unlawful distribution of controlled substances, specifically, methamphetamine, a Schedule II controlled substance) will be found by searching the TARGET VEHICLE described in Attachment A.  Based upon my training and experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their vehicles, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by WETMORE.

Respectfully submitted,


/s/ Christopher J. Toomey
Christopher J. Toomey, Task Force Officer
Federal Bureau of Investigation


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.


Date: Feb 11, 2022
Time: 3:18 PM, Feb 11, 2022

Honorable Andrea K. Johnstone
United States Magistrate Judge

**ATTACHMENT A**

*Property to be Searched*

The property to be searched is the entire passenger compartment and trunk or storage space,

and any closed or locked containers found therein, including mobile electronic devices, of the

**Black 2021 Nissan Sentra (TARGET VEHICLE)**
**Bearing VIN 3N1AB8CV4MY206862**
**with Massachusetts license plate 2AEW38**

which is currently in the possession of the Nashua Police Department at 28 Officer James Roche

Drive, Nashua, New Hampshire.

## ATTACHMENT B
### Items to be Seized

1.  Controlled substances including, but not limited to methamphetamine;

2.  Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.  Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by WETMORE and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.  Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.  Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.  Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.  Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.  Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.  Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use, and of which may be used in conjunction with the distribution of controlled substances;

10. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts,

personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.   Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning WETMORE, business entities in which they are stakeholders, or co-conspirators; and

12.   Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.   For the cellular telephones assigned call number ▓▓▓▓ 2174 and ▓▓▓▓-8130 which are used primarily by WETMORE, I seek to search the telephones for:

a.   Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

b.   lists of customers and related identifying information;

c.   types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

d.   any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

e.   any information involving the travel to obtain controlled substances or the transportation of controlled substances;

f.   information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

g.   all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

h.   Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the TARGET VEHICLE described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of WETMORE, if found at the TARGET VEHICLE, to the fingerprint sensor of the devices respectively believed to be used by him for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.